FILED
IN OPEN COURT

AUG - 3 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:18-CR-292 |
| | ) | |
| ANDREW NOLAN, | ) | |
| | ) | |
| Defendant. | ) | |

### STATEMENT OF FACTS

The United States and the defendant, ANDREW NOLAN (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

### I. RELEVANT INDIVIDUALS AND ENTITIES

1. Metropolitan Washington Airports Authority ("MWAA") was created with the consent of the United States Congress and the District of Columbia, "to plan, provide and actively manage world class access to the global aviation system in a way that anticipates and serves the needs of the National Capital area." Part of MWAA's mission is to develop, promote, and safely operate Reagan National and Washington Dulles International Airports. MWAA manages the Dulles Corridor Metrorail Project.

2. The Dulles Corridor Metrorail Project ("Dulles Metrorail Project") is a 23-mile extension of the Silver Line of Washington D.C.'s existing Metrorail System, which is being built in two phases by MWAA to extend Metrorail service to Washington Dulles International Airport and Loudoun County. Phase 1 of the Dulles Metrorail Project opened on July 26, 2014, connecting East Falls Church with Tysons Corner and Reston, Virginia with Washington D.C. and Largo, Maryland. Preliminary construction for Phase II began in 2014 and is ongoing. Phase II is expected to run from the eastern edge of Reston, Virginia to Washington Dulles International Airport and to Ashburn in Loudoun County, Virginia.

3. The Silver Line is operated by the Washington Metropolitan Area Transit Authority ("WMATA"). WMATA was created by an interstate compact between the District of Columbia, Maryland, and Virginia in 1967 to plan, develop, build, finance, and operate a balanced regional transportation system in the national capital area.

4. Capital Rail Constructors ("CRC"), which is located in Herndon, Virginia within the Eastern District of Virginia, is the prime contractor for the Dulles Metrorail Project.

5. Company A, a subcontractor for CRC, produced architectural and structural precast concrete for various projects including the Dulles Metrorail Project. Company A is headquartered outside the Commonwealth of Virginia.

6. Defendant Andrew Nolan ("NOLAN") worked for Company A from January 2014 to June 2016. From approximately January 2014 through late June 2016, NOLAN worked in Company A's Quality Control ("QC") department and from approximately March 2015 to late June 2016, NOLAN served as the QC Manager. As QC Manager, NOLAN reported directly to the Vice President of Operations for Company A.

## II. THE DULLES METRORAIL PROJECT

7. The federal government, through the U.S. Department of Transportation, provided funding to MWAA for the Dulles Metrorail Project. Specifically, the U.S. government has provided approximately $1.2 billion to MWAA for the design and building of Phase II of the Dulles Metrorail Project through a Transportation Infrastructure Finance and Innovation Act ("TIFIA") loan, which is administered by the U.S. Department of Transportation. Moreover, the U.S. government has provided approximately $403.3 million and $195 million to Fairfax and Loudoun counties, respectively, for the Dulles Project through TIFIA loans.

8. In or around 2013, MWAA awarded a design build contract for Phase II of the Dulles Metrorail Project to CRC.

2

9. In or around January 2014, CRC executed a purchase order agreement ("Agreement") with Company A to provide precast concrete panels for Phase II of the Dulles Metrorail Project for approximately $6.1 million. The Agreement detailed certain specifications regarding QC requirements for precast panels.

10. Furthermore, pursuant to the terms of the Agreement, Company A was required to perform specific quality control tests on each batch of concrete mixed for the Dulles Metrorail Project, including a test for air content. For example, pursuant to the terms of the Agreement, air content for precast concrete was required to be between 4.5 percent and 7.5 percent.

11. Air content was measured by pouring the concrete into a testing device used to measure the amount of air in the concrete. The primary benefit of entrained air in hardened concrete is the resistance that small air voids provide to freeze/thaw damage and scaling. Without room for expansion during freezing temperatures, water that becomes ice in the concrete can generate expansive pressure that may rupture the concrete.

12. Pursuant to the terms of the Agreement, Company A was required to record and maintain records of the quality control tests performed on concrete for Phase II of the Dulles Metrorail Project. Additionally, Company A was required to provide quality control records to CRC and make the records available for audit by MWAA and the Department of Transportation.

13. As QC Manager, NOLAN supervised other employees in Company A's QC department. NOLAN and QC employees under his supervision were responsible for conducting quality control tests on concrete, including but not limited to tests for air content, slump, and compressive strength (collectively, "quality control tests").

14. As part of their duties as QC employees, NOLAN and other QC employees maintained records of the results of quality control tests for review by customers and also for audit

by inspectors from the Precast/Prestressed Concrete Institute ("PCI"), as part of Company A's PCI certification process.

## III. THE CONSPIRACY AND SCHEME TO DEFRAUD

15. From at least in or about 2015 through at least in or about June 2016, within the Eastern District of Virginia and elsewhere, the defendant, ANDREW NOLAN, did knowingly and intentionally conspire with others, including Employee 3, to commit an offense against the United States, namely wire fraud, in violation of Title 18, United States Code, Section 1343; that is: having devised a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses and representations, caused to be transmitted by means of wire communications in interstate commerce certain signs, signals, and sounds for the purpose of executing such scheme or artifice, all in violation of Title 18, United States Code, Section 371.

16. The purpose of the conspiracy was to obtain money through false statements and misleading representations.

### A. OVERT ACTS

17. While NOLAN worked in the QC department, Company A produced concrete for the Dulles Metrorail Project that was consistently below 4 percent air content, which was outside of the required contractual specification.

18. NOLAN and others knew that if CRC had known the air content for concrete for the Dulles Metrorail Project was below 4 percent, CRC would reject the concrete.

19. When NOLAN first began his employment at Company A, he was a technician in the QC department. The then QC manager that trained NOLAN instructed NOLAN to record air content results within the acceptable air content range whether or not such results were actually accurate.

4

20. As QC manager, NOLAN personally recorded false results for air content tests in Company A's quality control records for Phase II of the Dulles Metrorail Project to make it appear the air content for concrete was within the required range of acceptable air content for the project.

21. Furthermore, on multiple occasions NOLAN instructed subordinate QC employees, including Employee 1 and Employee 3, to records false results for air content tests in Company A's quality control records for Phase II of the Dulles Metrorail Project. The false results made it appear that the air content for concrete was within the required range of acceptable air content for Phase II of the Dulles Metrorail Project.

22. On or about December 18, 2015, for example, after NOLAN received a request for quality control records for Phase II of the Dulles Metrorail Project, NOLAN told Employee 1: "We cannot give them sheets with any testing data out of specs. They will reject those panels. We have to change the data."

23. In another example, because of NOLAN's instructions to falsify test results, Employee 3 took records from the office and falsified them while at home.

24. Accordingly, the false quality control records for Phase II of the Dulles Metrorail Project created by NOLAN and others were provided to CRC and were subsequently made available for audit by MWAA and the United States Department of Transportation.

25. Beginning no later than 2015, and continuing through at least June 2016, Company A submitted monthly invoices to CRC for precast concrete manufactured for Phase II of the Dulles Metrorail Project. For example, on or about December 23, 2015, in furtherance of the scheme to defraud, Company A, located outside the Commonwealth of Virginia, submitted an invoice via interstate wire to CRC, located in the Eastern District of Virginia, in order to pay for precast concrete panels that failed to meet required air content specifications.

26. From approximately January 2014 through late June 2016, NOLAN received his salary and wages from Company A. NOLAN did not receive any bonuses, additional compensation, or other personal benefit in exchange for the conduct described herein.

27. Each invoice from Company A to CRC included a signed certification that affirmed "[t]he undersigned Contractor certifies to the best of the Contractor's knowledge, information, and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents...".

28. In addition to monthly invoices, Company A provided CRC with a Bill of Sale that warranted "the Property complies in all respects with the Contract Documents."

29. As a result, Company A submitted fraudulent invoices to CRC, which in turn subsequently submitted claims for payment to MWAA. MWAA then subsequently requested disbursement of funds from the TIFIA loan from the U.S Department of Transportation.

30. Between in or around December 2015 and July 2016, CRC transferred more than $737,124 to Company A as compensation for precast concrete provided to Phase II of the Dulles Metrorail Project. Between in or around January 2015 and July 2016, CRC transferred approximately $1,615,804.90 to Company A as compensation for precast concrete provided to Phase II of the Dulles Metrorail Project.

31. As of May 2018, the U.S. Department of Transportation has disbursed approximately $892,679,445.92 to MWAA, in periodic installments, to reimburse MWAA for payments made to CRC for Phase II of the Dulles Project, including for panels provided by UCP.

IV. CONCLUSION

32. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to

the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

33. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: *[signature]*
Uzo Asonye
Assistant United States Attorney

7

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, ANDREW NOLAN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
ANDREW NOLAN
Defendant

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
John Lauro (MGC)
Attorney for ANDREW NOLAN